## In re PENNELL.

## PENNELL v. HENDRICKSON.

(Circuit Court of Appeals, Third Circuit. April 29, 1914. Rehearing Denied June 6, 1914.)

### No. 1613.

1. BANKRUPTCY (§ 136*)—COMPELLING TRANSFERS BY BANKRUPT TO TRUSTEE—SUFFICIENCY OF EVIDENCE.

In a proceeding in bankruptcy in which the bankrupt was ordered by the referee to pay a specified sum to the trustee, evidence *held* to support the finding that the bankrupt had in his possession or under his control the amount so ordered paid.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 233, 235; Dec. Dig. § 136.*]

2. BANKRUPTCY (§ 467*)—REVIEW OF PROCEEDINGS—QUESTIONS OF FACT.

Where the referee in bankruptcy and the District Court are in accord upon the facts, their conclusions will not be lightly disturbed.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 929; Dec. Dig. § 467.*]

3. BANKRUPTCY (§ 136*)—COMPELLING TRANSFER BY BANKRUPT TO TRUSTEE.

The referee in bankruptcy, in a proceeding by the trustee to compel a bankrupt to turn over money in his possession or under his control, should in the first instance have merely found that such money was in his possession or under his control at the date of bankruptcy, leaving its subsequent disposition for inquiry under such further proceedings as might be taken.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 233, 235; Dec. Dig. § 136.*]

Petition to Review Order of the District Court of the United States for the District of New Jersey; John Rellstab, Judge.

Bankruptcy proceeding against John F. Pennell. Petition of bankrupt to review an order affirming an order of the referee requiring the bankrupt to pay a specified sum to George D. Hendrickson, trustee. Modified and affirmed.

Addison S. Pratt, of New York City, for petitioner.

Jerome C. Lewis, of New York City, for respondent.

Before BUFFINGTON and McPHERSON, Circuit Judges, and WITMER, District Judge.

J. B. McPHERSON, Circuit Judge. On April 17, 1911, the referee ordered the bankrupt to pay over to his trustee the sum of $19,-132.25, "being property of the estate of said bankrupt now in his possession or under his control, within ten days after the service of a copy of this order upon him." This order was affirmed by the District Court in February, 1912, and the case is now before us for review.

[1] The facts will appear from the following opinion of Judge Rellstab:

"The referee, on July 7 (April 17?), 1911, made an order directing the bankrupt to pay over the sum of $19,132.25. He, by a previous order dated No-

vember 30, 1908, directed the bankrupt to pay over to the trustee $49,710.75. On December 12, 1908, he made another order denying bankrupt's application to reopen the case and permit him to introduce new testimony. Both of these orders were set aside; the court, in its memorandum of April 12, 1909, saying:

"'Under the circumstances I think the referee should have reopened the case and permitted the introduction of such additional testimony on behalf of the parties or either of them, as might be offered. Without prejudging the merits of the case, it can properly be said that the testimony is not clear and convincing, certainly it is not so clear and convincing to me as it seems to have been to the referee. The amount in controversy is large, and as it is apparent that there are many sources of information open to the parties, through and by means of, which the testimony of the bankrupt can probably be either entirely corroborated or utterly disproved, therefore for the satisfaction of the court and in the interest of justice an opportunity should be afforded the parties to produce such testimony. It should be borne in mind, however, that the burden of proof in this matter rests primarily on the trustee, and his case must be sustained by clear, satisfactory and convincing proof.'

"Thereupon additional testimony was taken on behalf of the bankrupt. The sum previously found by the referee to have been withheld by the bankrupt was the amount which he, as the administrator of his brother's (Arthur R. Pennell's) estate, paid to himself as one of the residuary legatees.

"His brother died testate on March 10, 1903. By his will, he, after making some trivial bequests and devising his real estate to his wife, gave all his estate to his wife, mother, and brother John F. Pennell, the bankrupt. Both he and his wife died as the result of an automobile accident; he dying first. The bankrupt was appointed the administrator with the will annexed. The personal estate consisted almost entirely of insurance policies, and was inventoried at the sum of $220,745.06. Some of these insurance policies, however, were not collected in full. The bankrupt's affidavit filed in the administration of such estate, and made for the express purpose of having the Surrogate determine the cash value of the estate of which the deceased died seised and possessed, and the amount of tax to which it was liable under the state laws, shows that the entire personal estate was valued at $183,708.28, and that after deducting claims allowed, funeral and testamentary expenses, there was in the hands of the administrator the sum of $151,232.25 for distribution, of which bankrupt was entitled to the sum of $49,710.75, the amount which the referee, by his first order, found was the amount that the bankrupt should turn over to the trustee.

"Included in the claims presented and allowed was one to Henry W. Lamb, administrator of the estate of Carrie L. Pennell (testator's widow), deceased. At the time of the first order the bankrupt alone gave testimony concerning the disposition of these moneys, and he then testified, in substance: That none of this $49,710.75 was retained by him, but that it, with the other moneys which such affidavit disclosed was held for distribution, was used in the payment of the testator's debts. That his brother's estate was heavily involved and proved to be insufficient to pay all of his debts. That shortly after the death of his brother he found a paper in the deceased's safe giving the names of and amounts due certain creditors, and which he considered as a command of his brother to pay. These names and amounts are as follows: Sarah H. Pennell, $12,000.00; Elizabeth H. Pennell, $7,500.00; Carrie L. Pennell, $20,000.00; and Susan T. Goodwin, $141,000.00; total $180,500.00. That none of the claims of such persons were presented to him as administrator except that of Carrie L. Pennell, testator's widow. That such claims were withheld pursuant to an arrangement made between him and the representatives of such other persons, for the reason that the insurance companies were resisting the payment of the policies upon the ground that his brother's death was suicidal, a suspicion engendered by the circumstances of his death, and by his name being involved in a scandal with a woman whose husband had been mysteriously murdered but a few days prior to such accident, and that a disclosure of these claims, which would show the estate

to be insolvent, would strengthen such suspicion and make it more difficult to effect a satisfactory settlement with the insurance companies; but that they were to be paid out of the moneys to be realized, as far as they would go. The paper containing these names was not produced; the bankrupt stating that he destroyed it immediately after he got it from the safe.

"On the first day of the bankrupt's examination, he persistently refused to give the names of the creditors or the amounts said to be due them, or where he kept the money which he said he subsequently paid over to them. At a subsequent hearing, however, he gave this information. He also said that he paid the four people whose names were on that paper about $150,000; that such payments were made about the following May, about 16 months after the paper was destroyed; that he did not know the date of the payments, refusing to answer whether the payments were made at one time or within two or three days or a week or a month after he got the money. He also said that the estate of his brother's widow did not receive the one-third of his brother's estate, but only $20,000, the amount mentioned in his brother's instructions. He also said that the four persons named on this paper received only about 85 per cent. of their claims. Bankrupt here was only speaking approximately, but such a percentage of the total amount of those claims would be $153,425, about $2,000 more than the transfer tax deposition showed was in his hands for distribution. The administrator of the estate of Carrie L. Pennell, deceased, did not receive any of this $151,232.25. What he received was the $20,000 mentioned under the head of claims allowed, and which, if it had not been so allowed, would have increased the sum in the hands of the administrator for distribution, to the sum of $171,232.75. As the sum of $49,710.75 is admittedly the one-third of the estate after payment of all allowed debts and expenses, the entire amount available for the payment of the claims not presented to the administrator would be the sum of $149,132.25. As the bankrupt at the time of the making of the referee's first order did not claim that he paid more than $150,000 to the four creditors named in the paper taken from his safe, and as the estate of Carrie L. Pennell did not get the $20,000 said to be due her out of such sum, it follows, on bankrupt's own showing, that he retained in his hands the sum of $19,132.25, the amount directed to be turned over by the order now under review. In the face of the documentary evidence emanating from and sworn to by him, the burden was on him to satisfactorily show a disposition of the moneys different from that indicated by such documents, if a different disposition was made. He claimed that such was the case, but his own accounts, given their utmost effect, leave unaccounted for the last-named sum.

"Turning now to the testimony taken since the first order was set aside, the refusal to take which, when offered by the bankrupt, was the controlling reason for setting aside such order, we find that the bankrupt has not availed himself of the opportunity to take the stand and give a more explicit and satisfactory account of the disbursement of such money, but that he contented himself with the calling of witnesses with whom he dealt in administering the estate, and to some of whom he said he paid all of the money traced into his hands by such transfer tax deposition. These, however, do not support his contention that he paid out all of such moneys. On the contrary, they establish that the bankrupt retained in his possession approximately $20,000. William M. Pennell, the person who represented all the claimants named in the paper taken from the decedent's safe other than his widow, stated that he received approximately $130,000 from the bankrupt on account of such claims. He could not give the exact amount, claiming to have lost the memorandum showing the exact figures.

"In substance his testimony shows that the bankrupt paid him moneys at different times and places and in different amounts, aggregating between $145,000 and $150,000; that the first payment was approximately $20,000, which, however, was paid back to bankrupt at latter's request to meet the requirements of the surety company who was on his bond as administrator; that thereafter the money transaction was begun all over again, and that he then obtained from bankrupt in three several payments the total of $125,000 or $130,000. In this behalf he said:

"'Q. Can you tell me whether you received all this money at one time or not?

"'A. I did not receive it all at one time. I received it in at least three different times.

"'Q. Do you remember the approximate dates and amounts?

"'A. They will have to be approximate. I received early in May, 1904, my recollection is the first time was $90,000. Then subsequently I received, I think, it was practically $30,000, and then one further payment of $5,000 or $10,000, I don't remember which, but in all about $130,000. * * *

"'Q. What did you do with this first payment of $90,000 that you received?

"'A. I deposited the bulk of Mrs. Goodwin's part of it in two Boston banks, and turned over I think $20,000 of it to my sister.

"'Q. What were the names of the banks you deposited it in?

"'A. I deposited $40,000 in the New England National Bank, and I think $20,000 in the First Ward National Bank.

"'Q. Have you got the date when you deposited that money?

"'A. I deposited the $40,000 in the New England National Bank on the 14th of May, 1904.

"'Q. And the $20,000?

"'A. I think the $20,000 that same day in the First Ward National Bank.

"'Q. What did you do with the remaining $30,000?

"'A. I think I deposited $10,000 in Portland for Mrs. Goodwin, and the balance I think I gave to my sister to deposit in her bank in Boston. I can't remember definitely. You see I didn't charge my memory with these things. I did have a memorandum of everything I did which was in a small book in my desk at the time of the fire. * * *

"'Q. What did you do with the second payment of $30,000?

"'A. That I don't remember.

"'Q. Did you deposit it in any bank?

"'A. I can't say whether I gave it to the parties to deposit, or whether I deposited it for them.

"'Q. By the parties you mean Mrs. Goodwin and your sister?

"'A. I don't think my sister, because I think my sister received practically all that was coming from my mother's estate. The balance was given to Mrs. Goodwin, and I think I gave it to her personally.

"'Q. What was the amount your sister received?

"'A. My sister received $12,000 from my mother and $7,500 for herself. There was no deduction made from their claims. The deductions were made wholly from Mrs. Goodwin's share. She didn't receive all that was due her, but my mother and sister did receive all that was due them.

"'Q. The last payment, what did you do with that?

"'A. I turned it over to Mrs. Goodwin; that is all I can say.

"'Q. You don't remember whether you deposited it first?

"'A. I am quite sure I didn't. I think I took the money to her.'

"This testimony and that of Henry W. Lamb supports the bankrupt's general statement that he paid about $150,000 to the creditors named on that slip, but it negatives the contention that this was the $150,000 that was left in his hands for distribution upon the settlement of his brother's estate. As stated, Mr. Lamb, the administrator of Carrie L. Pennell's estate, received but $20,-000, and this was in payment of a bond held by her against her husband Arthur P. Pennell's estate, and for which bankrupt, as the administrator of that estate, claimed allowance in his deposition ascertaining and fixing the amount upon which the state's transfer tax was to be paid. The payment to him, therefore, did not in any manner reduce the sum of $149,232.25 left in his hands after the payment of all presented claims and expenses upon a settlement of his brother's estate, and of this amount the utmost that the proofs show was paid over to William M. Pennell, the representative of the other claimants whose names appeared upon the paper which was taken from decedent's safe, is the sum of $130,000. William M. Pennell does not say positively that it was $130,000. From his figures it would be $125,000 or $130,-000. Giving the bankrupt credit for the greater sum, the sum of $19,232.25 was still in his possession after he had made settlement with the creditors

whose claims were not presented or allowed in the administration proceedings. There is nothing in the case that permits of a different conclusion.

"The contention made by bankrupt's counsel that the $20,000 paid to William M. Pennell, and which he testified was returned to the bankrupt at his request and subsequently repaid to William M. Pennell, is unwarranted. Not only did William M. Pennell say that after such repayment the matter of the payments was begun all over again, but he distinctly said that the moneys secured by him on account of the claims he represented amounted approximately to $130,000; and his detailed explanation of the amounts received indicates that, if $130,000 was not the exact amount received, it was less. That the bankrupt expected to obtain a substantial sum from his brother's estate is shown by the contract entered into between him and E. Cooper Wills on or about July 28, 1903, more than four months after his brother's death and his appointment as administrator. Under this agreement he was to pay Wills $5,000 for a patented process in the making of steel, which was to be turned over to a corporation of which the bankrupt was to be secretary and treasurer; and in furtherance of the business to be conducted by such corporation bankrupt was to advance an additional sum of $10,000. On this contract bankrupt only paid the sum of $1,000, repudiating the remainder of his obligations. There is some conflict between the bankrupt and Wills and Swart, the latter being the person who induced bankrupt to enter into such enterprise, as to the reasons given by bankrupt, first for the delay in carrying out his obligation, and latterly for his repudiation thereof. But, irrespective of the merits of this controversy, the facts stand out prominently that the bankrupt did obligate himself for nearly the sum that the referee has found he withholds from the trustee.

"Previous to his brother's death, bankrupt was making a living as a commercial salesman on commission, earning not more than $150 a month. Considering his entering into this contract as the act of a rational being, we must conclude that he was looking to a source for the moneys to meet his obligations different from his previous occupation. This contract was made at a time when he knew of the existence of these creditors named on the slip which he had taken from his brother's safe, aggregating $180,500, the making of the agreement for their payment, that the insurance companies were resisting the payment of their policies, and that if such policies were paid in full, which was not then probable, the allowance of such claims, plus the funeral and administration expenses, would not net him as the residuary legatee of one-third of the estate, an amount sufficient to meet the obligations thus incurred.

"Full opportunity has been given bankrupt to show what disposition was made of the moneys traced into his possession. His explanation lacks frankness, is meager, and couched in the most general terms. Some of it was obtained after he had persistently refused to testify, and much more only after persistent prodding. His possession of the moneys was so recent before the time of testifying that general statements of how it was handled and disposed of lack force if not probity, and the details of such disposition given by the witnesses called by him, and through whom such disposition is said to have been made, clearly prove he did not disburse to them the sum mentioned in the order now under consideration. In such circumstances the presumption is that the bankrupt still has such moneys in his possession or under his control.

"The order of the referee of July 7, 1911, is affirmed."

[2, 3] The referee and the District Court being in accord upon the facts, their conclusions will not be lightly disturbed. Epstein v. Steinfeld (C. C. A., 3d Cir.) 210 Fed. 236, 127 C. C. A. 54. As we see no reason for disagreeing with the findings before us, we accept them as correct. It follows that the order under review should be affirmed in substance, although it needs to be modified in one particular. It will be observed that the referee's order (affirmed in all respects by the District Court) declares that the bankrupt has the sum of money

named "now (April 17, 1911) in his possession or under his control." But the inquiry has not yet reached that stage. The date involved in the referee's investigation was the date of bankruptcy, and that was June 4, 1906. The proper practice on applications for an order to pay over is stated in detail by the court of appeals in Re Epstein. It is therefore necessary to modify the order under review by striking out the word "now," and by adding after "control" the words "on the date of bankruptcy, namely, June 4, 1906." What may have become of the money since that time is a subject for inquiry under such further proceedings as may be taken.

Thus modified, the order is affirmed.